UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )  Civil Action No. _____ |
| | )  JURY TRIAL DEMANDED |
| SHUANG CHEN, | ) |
| LIRONG GAO, | ) |
| JING GUAN, | ) |
| TONGHUI JIA, | ) |
| XUEJIE JIA, | ) |
| VICKY LIU, | ) |
| SHUN SUI, | ) |
| LUJUN SUN, | ) |
| HUAILONG WANG, | ) |
| JIADONG WANG, | ) |
| JIAFENG WANG, | ) |
| JIALI WANG, | ) |
| XIAOSONG WANG, | ) |
| LINLIN WU, | ) |
| LIN XING, | ) |
| YONG YANG, | ) |
| JIANCHENG ZHAO, and | ) |
| FORREST (HK) CO., LIMITED | ) |
| | ) |
| Defendants. | ) |
| | ) |
| WEIGUO GUAN, | ) |
| JINGQUAN LIU, | ) |
| RISHAN LIU, | ) |
| LUPING WANG, | ) |
| WEIGANG YANG, and | ) |
| JINGRU ZHAI | ) |
| | ) |
| Relief Defendants. | ) |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants Shuang Chen, Lirong Gao, Jing Guan, Tonghui Jia, Xuejie Jia, Vicky Liu,

Shun Sui, Lujun Sun, Huailong Wang, Jiadong Wang, Jiafeng Wang, Jiali Wang, Xiaosong

Wang, Linlin Wu, Lin Xing, Yong Yang, Jiancheng Zhao, and Forrest (HK) Co., Limited (collectively, the "Defendants"), and Weiguo Guan, Jingquan Liu, Rishan Liu, Luping Wang, Weigang Yang, and Jingru Zhai (collectively, the "Relief Defendants").

## SUMMARY

1.      From at least August 2013 through the present (the "Relevant Period"), the Defendants engaged in a market manipulation scheme, using dozens of accounts at several different brokerage firms to artificially influence the prices of many publicly traded securities. The design and intent of the Defendants' scheme was to create the false appearance of trading interest and activity in particular stocks, thereby enabling them to reap illicit profits by artificially boosting or depressing stock prices.

2.      The Defendants generally used at least two brokerage accounts when manipulating the price of a particular publicly traded stock.  The Defendants first typically used at least one account to place multiple small purchase or sale orders to create upward or downward pressure on the stock price (hereinafter referred to as a "helper" account).  Then, the Defendants typically used at least one other account (hereinafter referred to as a "winner" account) to purchase or sell larger quantities of stock at prices that had been affected by the manipulative orders placed by the helper account(s).  The Defendants often held the winner and helper accounts at different brokerage firms to conceal from each brokerage firm the coordination between the two types of accounts.

3.       In addition to the manipulative trading itself, the Defendants engaged in other deceptive conduct designed to avoid detection, such as Xiaosong Wang and Jiali Wang using nominee accounts held in the names of individuals and entities other than themselves, and misrepresenting the nature of their trading to brokerage firms.

4.      The Defendants' scheme was successful.  During the Relevant Period, the Defendants collectively generated millions in illegally obtained proceeds.

5.      By virtue of the foregoing conduct and as alleged further herein, the Defendants violated, and aided and abetted each other's violations of, Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(1), (3), and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78i(a)(2), 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), (c).

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

6.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b), (d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

7.      The Commission seeks emergency preliminary relief, including a temporary restraining order against further violations of the federal securities laws and an emergency asset freeze to preserve the assets necessary to satisfy an eventual judgment against the Defendants and the Relief Defendants.  The Commission also requests an immediate accounting, a repatriation order, expedited discovery, and an evidence preservation order to facilitate the prompt resolution of this matter on the merits.

8.      The Commission further seeks: (1) the entry of a permanent injunction against the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; (2) disgorgement of ill-gotten gains, together with prejudgment interest from the Defendants and Relief Defendants; (3) imposition of civil monetary penalties against the Defendants; and (4) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to Securities Act Sections

20(b) and 22(a) [15 U.S.C. §§ 77t(b), 77v(a)] and Exchange Act Sections 21(d), 21(e), and 27

[15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Venue is proper in this district pursuant to Sections 20(b) and 22 of the Securities

Act [15 U.S.C. §§ 77t(b) and 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain Defendants reside and transact business in the District of Massachusetts for at least part

of the calendar year, and certain acts, practices, transactions, and courses of business constituting

violations occurred within the District of Massachusetts.

11.     The Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange in connection with the transactions, acts, practices and courses of business alleged in

this complaint.

## DEFENDANTS

### A.     Defendants With Massachusetts Residences

12.     **Jiali Wang**, 41, resides in Weifang, China, and also owns a residence in

Weymouth, Massachusetts.  According to brokerage account application documents, Jiali Wang

is married to Jing Guan and he is an at-home trader.  Jiali Wang's Massachusetts residence is

next door to Vicky Liu.

13.     **Jing Guan,** 38, resides in Weifang, China, and formerly shared a residence with

Jiali Wang in Marlborough, Massachusetts.  According to brokerage account application

documents, Guan is married to Jiali Wang and is the director and owner of Forrest (HK) Co.,

Limited.

14. **Vicky Liu,** 47, resides in Weymouth, Massachusetts.  Liu lives next door to Jiali Wang and was the sole listed officer of WV Forrest Investments, LLC, a company formed and funded by Jiali Wang.

15. **Xiaosong Wang**, 31, resides in Qingdao, China, and also owns a residence in Upton, Massachusetts.  According to brokerage account application documents, Xiaosong Wang is employed at Qingdao Huayi Textile and Clothing Co., Ltd.

**B.    Corporate Defendant**

16. **Forrest (HK) Co., Limited** is a Hong Kong corporation that purportedly provides market information consultation services (according to brokerage account application documents).  Jing Guan is the director and owner of Forrest (HK) Co., Limited.

**C.    Defendants With Chinese Addresses**

17. **Shuang Chen,** 33, resides in Huimin, China.  According to brokerage account application documents, Chen is employed at RuiZhi Computer Technology.

18. **Lirong Gao,** 29, resides in Taian, China.  According to brokerage account application documents, Gao is employed at Taian Tailian Xin Nengyuan Co. Ltd.

19. **Tonghui Jia,** 32, resides in Shanghai, China.  According to brokerage account application documents, Tonghui Jia is employed at Ya Lan Advertising Co.

20. **Xuejie Jia,** 30, resides in Taian, China.  According to brokerage account application documents, Jia is employed at Taian Huasheng Communication Technology Co. Ltd.

21. **Shun Sui**, 56, resides in Qingdao, China.  According to brokerage account application documents, Sui is retired.

22. **Lujun Sun,** 33, resides in Shanghai, China.  According to brokerage account application documents, Sun is employed at Shanghai Fulin Anzhuang Gongcheng Co. Ltd.

23.    **Huailong Wang,** 37, resides in Shanghai, China.  According to brokerage account application documents, Huailong Wang is employed at Baosteel Group Corporation.

24.    **Jiadong Wang,** 30, resides in Taian, China.  According to brokerage account application documents, Jiadong Wang is employed at Taian Jiankong Shebei Anzhuang Co. Ltd.

25.    **Jiafeng Wang,** 45, resides in Feicheng, China.  According to brokerage account application documents, Jiafeng Wang is employed at Yiyang Zhongxin Elementary School.

26.    **Linlin Wu,** 33, resides in Taian, China.  According to brokerage account application documents, Wu is employed at Taian Honghuanglan Parent-Child Paradise.

27.    **Lin Xing,** 32, resides in Weifang, China.  According to brokerage account application documents, Xing is employed at Weichai Power Co., Ltd.

28.    **Yong Yang,** 28, resides in Shanghai, China.  According to brokerage account application documents, Yang is employed at Shanghai Yilian Digital Technology Ltd.

29.    **Jiancheng Zhao,** 37, resides in Shanghai, China.  According to brokerage account application documents, Zhao is employed at Shanghai Baolaite Gas Co., Ltd.

## **RELIEF DEFENDANTS**

30.    **Weiguo Guan**, 66, resides in Weifang, China.  According to brokerage account application documents, Guan is retired.  Jiali Wang opened and traded in a brokerage account in Weiguo Guan's name and traded in at least one other brokerage account in Guan's name.

31.    **Jingquan Liu**, 61, resides in Qingdao, China.  According to brokerage account application documents, Liu is employed at Qingdao Sean Group Limited By Share Ltd.  Xiaosong Wang traded in at least one brokerage account in Jingquan Liu's name.

32.     **Rishan Liu**, 32, resides in Qingdao, China.  According to brokerage account application documents, Liu is employed at Qingdao Qi Yuan Engineering Technology Co., Ltd. Xiaosong Wang traded in at least one brokerage account in Rishan Liu's name.

33.     **Luping Wang,** 60, resides in Qingdao, China.  According to brokerage account application documents, Wang is retired.  Xiaosong Wang traded in at least one brokerage account in Luping Wang's name.

34.     **Weigang Yang**, 27, resides in Qingdao, China.  According to brokerage account application documents, Yang is employed at Qingdao Qiyuan Gongchengjishu.  Xiaosong Wang traded in at least one brokerage account in Weigang Yang's name.

35.     **Jingru Zhai**, 32, resides in Weifang, China.  According to brokerage account application documents, Zhai is employed at Weifang Jianhe Medical Devices Co. Ltd.  Xiaosong Wang opened and traded in at least one brokerage account in Jingru Zhai's name.

## STATEMENT OF FACTS
### Background: The Defendants' Relationships

36.     In or about early 2012, Jiali Wang began opening brokerage accounts, directly or indirectly, in his own name at various brokerage firms in the United States.  However, by early 2013, at least four of those accounts had been closed for compliance reasons.  Although Jiali Wang continued to maintain other brokerage accounts, he began working in concert with other individuals to open accounts in those other individuals' names and in the name of an entity, Forrest (HK) Co., Limited ("Forrest (HK)"), to disguise his trading.

37.     For example, in or about April 2013, Jiali Wang, directly or indirectly, opened a brokerage account in the name of Relief Defendant Weiguo Guan at a United States-based brokerage firm (the "Weiguo Guan Account").  To open the Weiguo Guan Account, Jiali Wang sent a financial account statement and utility bill in the name of Weiguo Guan to the brokerage

firm from the following email address: wangjiali6688@163.com.  After the Weiguo Guan

Account was opened, Jiali Wang traded through this account as well as another account in

Weiguo Guan's name.

38.    Jiali Wang also traded through various accounts in the name of Forrest (HK), an

entity that was owned by his wife, Defendant Jing Guan, according to brokerage account opening

documents.

39.    For example, on several dates during the Relevant Period, Forrest (HK) placed

orders to buy and/or sell stock from the same internet protocol ("IP") address[1] from which Jiali

Wang accessed brokerage accounts in his own name.  Jiali Wang also communicated on Forrest

(HK)'s behalf with one of Forrest (HK)'s brokerage firms, and he paid for Forrest (HK)'s use of

a trading platform.

40.    Xiaosong Wang similarly operated, directly or indirectly, brokerage accounts held

in the names of other individuals to disguise his trading.  For example, in or about early 2018,

Xiaosong Wang opened, directly or indirectly, an account at a United States-based brokerage

firm in the name of Relief Defendant Jingru Zhai.  To do so, Xiaosong Wang sent altered bank

statements to the brokerage firm.

41.    Specifically, on or about April 30, 2018, Xiaosong Wang removed, or caused to

be removed, his name and address from his own bank statement for the period December 15,

2017 through January 17, 2018, and replaced it with Jingru Zhai's name and purported address.

Xiaosong Wang also altered, or caused the alteration of, his bank statement by changing the last

---

[1] An IP address is a value made up of assigned numbers that identify how a particular computer or device accesses a
computer network, such as the Internet.  Every computer or device attached to a computer network requires an IP
address to connect to other networked computers.

four digits of his bank account number.  Xiaosong Wang sent, or caused to be sent, the fictitious

bank account statement to the brokerage firm.

42.     After the brokerage firm rejected the bank statement because it was too old,

Xiaosong Wang responded by altering, or causing to be altered, another one of his own bank

statements; this time for the period February 14, 2018 through March 16, 2018.  On or about

May 2, 2018, Xiaosong Wang sent, or caused to be sent, the new fictitious bank account

statement to the brokerage firm, which subsequently opened an account in Jingru Zhai's name.

43.     Xiaosong Wang subsequently traded during the Relevant Period, directly or

indirectly, in publicly traded stock through Jingru Zhai's account.

44.     During the Relevant Period, Xiaosong Wang also accessed and traded through

brokerage accounts held in the following Relief Defendants' names despite not being an

authorized trader on those accounts: Weigang Yang, Luping Wang, Jingquan Liu, and Rishan

Liu.  Xiaosong Wang accessed the accounts through one or more IP addresses associated with a

condominium he owns in Massachusetts while he was visiting Massachusetts from China.  Relief

Defendants Jingru Zhai, Weigang Yang, Luping Wang, Jingquan Liu, and Rishan Liu were not

in the United States when these trades were placed.

45.     Furthermore, as the table below illustrates, IP addresses, computer identifiers, and

banking transfers demonstrate that Jiali Wang, Xiaosong Wang, and the other individual

Defendants are working in concert.  In particular, accounts held in the name of each of the

Defendants listed in the chart below were accessed electronically using an IP address or MAC

address that also accessed accounts held in the names of Jiali Wang and Xiaosong Wang.  In

several instances, accounts held in the names of these Defendants also sent money to or received

money from accounts held in the names of Jiali Wang or Xiaosong Wang.

| | Jiali Wang Connection | Xiaosong Wang Connection |
|---|---|---|
| Shuang Chen | Accounts accessed from same IP address | Accounts accessed from same IP address |
| Lirong Gao | Accounts accessed from same IP address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address[2]<br>Transfer of funds[3] |
| Jing Guan | Accounts accessed from same IP address<br>Transfer of funds<br>Spouse of Jiali Wang | Accounts accessed from same IP address<br>Transfer of funds |
| Tonghui Jia | Accounts accessed from same IP address<br>Transfer of funds | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |
| Xuejie Jia | Accounts accessed from same IP address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |
| Vicky Liu | Accounts accessed from same IP address<br>Transfer of funds<br>Lives next door to Jiali Wang<br>Manager of company founded and funded by Jiali Wang | Accounts accessed from same IP address |
| Shun Sui | Accounts accessed from same MAC address | Accounts accessed from same IP address<br>Transfer of funds |
| Lujun Sun | Accounts accessed from same IP address | Accounts accessed from same IP address |
| Huailong Wang | Accounts accessed from same IP address<br>Accounts accessed from same MAC address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |
| Jiadong Wang | Accounts accessed from same IP address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |

---

[2] A MAC address is a unique value associated with a network adapter inside a computer or other device, which allows for the identification of the computer/device on a computer network.

[3] Transfers in the table are transfers to and/or from the Defendant denoted in the relevant column.

|  | **Jiali Wang Connection** | **Xiaosong Wang Connection** |
|---|---|---|
| Jiafeng Wang | Accounts accessed from same IP address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |
| Linlin Wu | Accounts accessed from same IP address<br>Transfer of funds | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |
| Lin Xing | Accounts accessed from same IP address | Accounts accessed from same IP address |
| Yong Yang | Accounts accessed from same IP address | Accounts accessed from same IP address |
| Jiancheng Zhao | Accounts accessed from same IP address | Accounts accessed from same IP address<br>Accounts accessed from same MAC address |

## The Market Manipulation Scheme

46.     During the Relevant Period, the Defendants, working alone or in concert with others, schemed to manipulate the market prices of more than 3,900 securities through coordinated trading designed to artificially affect the prices of those securities, and to induce others to buy and sell those securities at the resulting artificially high or low prices.

47.     The Defendants, acting in concert, typically manipulated the price of a security as follows:

> a.  One or more helper accounts placed orders on stock exchanges[4] to sell a thinly traded security at prices below the prevailing national best bid or offer ("NBBO").  These orders had two related functions:  (1) sell orders placed at

---

[4] As used herein, "exchange" means a national registered exchange that provides public information on security order prices.

prices at or below the prevailing national best bid ("NBB") were used to lower the NBB by removing buying interest at that price level, and (2) sell orders placed at prices above the prevailing NBB and below the prevailing national best offer ("NBO") were used to set new, lower NBOs.

b. After the NBBO had been artificially depressed, one or more winner accounts placed large buy orders on non-exchange venues.[5]  The operator(s) of the winner accounts typically placed the orders from accounts at different brokerage firms and/or in different names than the helper accounts.  These winner account orders were often placed while there were outstanding sell orders from helper accounts that should have at least partially filled them.  However, because the operator(s) of the winner accounts caused their orders to be sent to non-exchange venues, the winner and helper account orders rarely crossed.  Instead, the winner account orders were usually filled at artificially high or low prices within the manipulated NBBO at non-exchange venues.

c. Once the winner accounts had accumulated enough shares at the artificially depressed prices, the helper accounts canceled their outstanding sell orders because those orders were non-bona fide and designed to influence the price of the security, and the operators of those accounts started placing buy orders at prices above the prevailing NBBO.  As before, the orders had two related functions:  (1) buy orders priced at or above the prevailing NBO were used to increase the NBO by removing selling interest at that price level, and (2) buy

---

[5] As used herein, non-exchange venues refer to venues other than exchanges on or in which trades can be executed.

orders priced above the prevailing NBB, but below the prevailing NBO, were used to set new, higher NBBs.

d. After the NBBO had been artificially inflated, the operator(s) of one or more winner accounts placed large sell orders on non-exchange venues. As before, the operator(s) of the winner accounts typically placed the orders from accounts at different brokerage firms and/or in different names than the helper accounts, and also when outstanding buy orders from helper accounts should have at least partially filled the winner accounts' sell orders. However, because the operator(s) of the winner accounts sent the orders to non-exchange venues, the winner and helper account orders rarely met. Instead, the winner account orders were usually filled within the manipulated NBBO at non-exchange venues.

e. Once the operator(s) of the winner accounts sold their shares at the artificially inflated prices, the operator(s) of the helper accounts canceled their outstanding buy orders because those orders were non-bona fide and designed to influence the price of the security, and the process often began again.

48.    The Defendants also varied the format of their manipulative activity during the Relevant Period. For example, at times one or more of the Defendants purchased shares of a stock at its prevailing market price (essentially skipping Paragraphs 47.a. and 47.b.), and then manipulated the price upward and sold that stock at artificially inflated prices, as described in Paragraphs 47.c. to 47.e. At other times, the Defendants sold large amounts of stock short before manipulating the price of the stock downward, as outlined in Paragraphs 47.a. and 47.b., so they

could then cover their short sales by purchasing the stock at artificially low prices.[6]  While the Defendants varied the format of their manipulative activity in other ways as well, one consistent thread in their manipulations was the use of helper accounts to influence the NBBO or prices for securities so that winner accounts could buy or sell these securities at artificially depressed or inflated prices.

49.     Specific examples of some of the thousands of instances of manipulative trading by the Defendants designed to induce the purchase and sale of securities by other market participants at artificially high and/or low prices are summarized below.

**Example 1: CSSE (July 16 - 17, 2018; Xiaosong Wang. Shun Sui, Relief Defendant)**

50.     On or about July 16 and 17, 2018, Xiaosong Wang and Shun Sui used, directly or indirectly, multiple accounts to manipulate the stock price of Chicken Soup for the Soul Entertainment Inc. ("CSSE"), which is listed on NASDAQ.  Over this two day period, they generated approximately $6,233 in illegal profits.  What follows is a closer look at the trading during a few distinct periods.

**On July 16, 2018**:

a.  At about 12:33:04 PM, the NBBO for CSSE was $9.12 by $9.43 per share.

b.  Between about 12:33:04 PM and 12:37:29 PM, Xiaosong Wang and Shun Sui placed, directly or indirectly, numerous sell orders through two accounts in the name of Rishan Liu and one in the name of Shun Sui. These sell orders were generally sent at progressively lower prices from $9.41 to $9.12 per share, they ranged in size from 1 share to 500 shares, and they were sent to exchanges.

---

[6] A "short sale" is a sale of stock that an investor does not own, and a "cover" in this context means purchasing stock in order to return the borrowed stock that had been sold short to the lender.

c.  By approximately 12:37:29 PM, the NBBO for CSSE had fallen to $9.05 by $9.14 per share because of, at least in part, Xiaosong Wang's and Shun Sui's sell orders.

d.  At about 12:37:30 PM, Shun Sui placed, directly or indirectly, an order on an exchange to sell 200 shares of CSSE at $9.13 per share. At the same time, Xiaosong Wang placed, directly or indirectly, an order to buy 6,000 shares of CSSE with a limit price of $9.20 per share through an account in his own name. The 6,000 share order was immediately filled by another market participant at a price of $9.127 per share, and the 200 share sell order (along with twenty other sell orders priced from $9.14 to $9.41) was canceled at about 12:37:32 PM.

**On July 17, 2018**:

e.  At about 12:34:20 PM, the NBBO for CSSE was $9.22 by $9.46 per share.

f.  Between about 12:34:20 PM and 12:37:02 PM, Xiaosong Wang and Shun Sui placed, directly or indirectly, numerous buy orders through accounts in the names of Rishan Liu and Shun Sui. These buy orders were generally sent at progressively higher prices from $9.27 to $9.41 per share, they ranged in size from 100 to 1,300 shares, and they were sent to exchanges.

g.  By approximately 12:37:02 PM, the NBBO had risen to $9.41 by $9.46 per share because of, at least in part, Xiaosong Wang's and Shun Sui's buy orders.

h.  At about 12:37:03 PM, Shun Sui placed, directly or indirectly, an order on an exchange to buy 100 shares of CSSE at $9.42 per share; then, at about 12:37:04 PM, Wang placed, directly or indirectly, an order on an exchange to buy 400 shares of CSSE at $9.42 per share through Liu's account.  At about the same time, Wang placed, directly or indirectly, an order to sell 6,000 shares of CSSE with a

limit price of $9.39 per share through an account in his own name. The 6,000

share order was immediately filled by another market participant at a price of

$9.442 per share. Following the fill of the 6,000 share order, the 100-share and

400-share buy orders (along with nine other buy orders priced from $9.31 to

$9.41) were canceled at approximately 12:37:06 PM.

    i.    Through this coordinated trading from July 16, 2018 through July 17, 2018,

Xiaosong Wang was able to buy 6,000 shares of CSSE at a price of $9.127 per

share and then sell 6,000 shares of CSSE at a price of $9.442 per share.

**Example 2: HELE (May 30, 2018; Tonghui Jia, Huailong Wang, Jiadong Wang, Xiaosong Wang, and Jiancheng Zhao)**

51.    On or about May 30, 2018, Tonghui Jia, Huailong Wang, Jiadong Wang,

Xiaosong Wang, and Jiancheng Zhao used, directly or indirectly, multiple accounts to

manipulate the stock price of Helen of Troy Limited ("HELE"), which is listed on NASDAQ.

Over the course of the day, they generated approximately $10,103 in illegal profits.  What

follows is a closer look at the trading during a few distinct periods.

    a.    At about 9:32:49 AM, the NBBO for HELE was $91.65 by $92.45 per share.

    b.    Between approximately 9:32:49 AM and 9:34:44 AM, Jiancheng Zhao sent,

directly or indirectly, eighteen 100-share sell orders for HELE to exchanges at

progressively lower prices from $92.50 to $90.90 per share.

    c.    By about 9:34:44 AM, the NBBO for HELE had fallen to $90.90 by $91.20

per share because of, at least in part, Jiancheng Zhao's sell orders.

    d.    Then, at approximately 9:34:47 AM, Jiadong Wang sent, directly or

indirectly, a buy order to a non-exchange venue for 6,986 shares of HELE

with a limit price of $91.30.  At or about this time, Jiancheng Zhao had

16

several outstanding orders to sell 100-share blocks of HELE, including two 100-share orders to sell HELE at a limit price of $91.20 per share and two 100-share orders to sell HELE at a limit price of $91.25 per share. Jiadong Wang's 6,986-share buy order was filled by another market participant at a price of approximately $91.15 per share, and Jiancheng Zhao subsequently canceled, directly or indirectly, all of his unfilled sell orders.

e.   As a result of his direct or indirect sales, Jiancheng Zhao was short 1,600 shares of HELE stock by about 9:34:49 AM.

f.   At about 10:16:11 AM, the NBBO for HELE was $92.40 by $92.55 per share, and Tonghui Jia placed, directly or indirectly, an order to sell 1,600 shares of HELE stock with a limit price of $92.50 per share. Two seconds later, at approximately 10:16:13 AM, Jiancheng Zhao placed, directly or indirectly, an order to buy 1,600 shares of HELE stock with a limit price of $92.50 per share, and 1,600 shares of HELE stock effectively moved from Tonghui Jia's account to Jiancheng Zhao's account, thereby covering Jiancheng Zhao's short position.

g.   At about 11:23:13 AM, the NBBO for HELE was $92.35 by $92.55 per share.

h.   Between approximately 11:23:13 AM and 11:23:59 AM, Huailong Wang, Xiaosong Wang, and Jiancheng Zhao sent, directly or indirectly, nineteen 100-share buy orders for HELE to exchanges at progressively higher prices from $92.45 to $93.05 per share.

i.  By approximately 11:23:59 AM, the NBBO for HELE had risen to $92.75 by $92.85 per share because of, at least in part, Huailong Wang's, Xiaosong Wang's, and Jiancheng Zhao's buy orders.

j.  At approximately 11:23:59 AM, Jiadong Wang sent, directly or indirectly, a sell order to a non-exchange venue for 6,986 shares of HELE with a limit price of $92.70 per share.  This was the same number of shares that he had purchased, directly or indirectly, earlier that day, and his order was partially filled by another market participant at prices between $92.70 and $92.75 per share, leaving him with 5,611 shares of HELE.  However, by the time Jiadong Wang canceled, directly or indirectly, the remainder of his order at about 11:24:45 AM, the NBBO for HELE had fallen to $92.55 by $92.65 per share.

k.  Between approximately 11:25:00 AM and 11:25:57 AM, Xiaosong Wang and Jiancheng Zhao sent, directly or indirectly, at least thirteen buy orders to exchanges.  The buy orders ranged in size from 4 shares to 102 shares and ranged in price from $92.55 to $92.80 per share.

l.  By approximately 11:25:57 AM, the NBBO for HELE had risen again to $92.65 by $92.80 per share because of, at least in part, Xiaosong Wang's and Jiancheng Zhao's buy orders.

m.  At approximately 11:25:57 AM, Jiadong Wang sent, directly or indirectly, a sell order to a non-exchange venue for his remaining 5,611 shares of HELE with a limit price of $92.60 per share.  At this time, Xiaosong Wang and Jiancheng Zhao had three outstanding 100-share orders to buy HELE with

18

limit prices of $92.65 per share.  Jiadong Wang's 5,611 sell order was filled

by another market participant at a price of approximately $92.66 per share.

n.  Through this coordinated and manipulative trading, Jiadong Wang was able to

buy, directly or indirectly, 6,986 shares of HELE at $91.15 per share and then

sell 6,986 shares of HELE at prices between $92.66 and $92.75 per share.

### Example 3: RARE (May 1, 2018; Lirong Gao, Lujun Sun, and Lin Xing)

52.    On or about May 1, 2018, Lirong Gao, Lujun Sun, and Lin Xing used, directly or

indirectly, multiple accounts to manipulate the stock price of Ultragenyx Pharmaceutical Inc.

("RARE"), which is listed on NASDAQ.  Over the course of the day, they generated

approximately $13,434 in illegal profits.  What follows is a closer look at the trading during a

few distinct periods.

a.  At about 1:16:25 PM, the NBBO for RARE was $50.64 by $50.75 per share.

b.  Between approximately 1:16:25 PM and 1:24:43 PM, Lirong Gao and Lin

Xing sent, directly or indirectly, 48 sell orders for RARE to exchanges.  The

orders ranged in size from 30 shares to 500 shares (but were typically for 100

shares), and Lirong Gao and Lin Xing placed them, directly or indirectly, at

progressively lower prices from $50.75 to $50.42 per share.

c.  By about 1:25:23 PM, the NBBO for RARE had fallen to $50.42 by $50.48

per share because of, at least in part, Gao's and Xing's sell orders.

d.  At approximately 1:25:23 PM, Lujun Sun sent, directly or indirectly, a buy

order to a non-exchange venue for 9,500 shares of RARE with a limit price of

$50.50, and received an immediate partial fill from another market participant

at about $50.47 per share.  Seconds later, between approximately 1:25:27 PM

and 1:25:37, Lin Xing and Lirong Gao sent, directly or indirectly, at least seven sell orders to exchanges for RARE shares. The orders ranged in size from 100 shares to 600 shares and ranged in price from $50.50 to $50.59 per share. Following the orders, at 1:25:38 PM, another market participant sold, directly or indirectly, Lujun Sun the remaining shares of RARE on his order at $50.50 per share.

e.   At about 2:04:11 PM, the NBBO for RARE was $51.70 by $51.84 per share.

f.   Between approximately 2:04:11 PM and 2:04:29 PM, Lirong Gao sent, directly or indirectly, six 100-share buy orders for RARE to exchanges at prices ranging from $51.70 to $51.88 per share.

g.   By approximately 2:04:32 PM, the NBBO for RARE had risen to $51.78 by $51.89 per share because of, at least in part, Lirong Gao's buy orders.

h.   At approximately 2:04:32 PM, Lujun Sun sent, directly or indirectly, a sell order to a non-exchange venue for 9,500 shares of RARE with a limit price of $51.75 per share. This was the same number of shares that he had purchased, directly or indirectly, earlier that day, and his order was filled by another market participant at a price of $51.797 per share. Seconds later, Lirong Gao canceled, directly or indirectly, his two outstanding 100-share sell orders for RARE with limit prices of $51.75 per share.

i.   Through this coordinated and manipulative trading, Lujun Sun was able to buy, directly or indirectly, 9,500 shares of RARE at prices between $50.458 and $50.50 per share and later sell, directly or indirectly, 9,500 shares of RARE at a price of $51.797 per share.

20

**Example 4: DWSN (January 27, 2017; Xuejie Jia, Yong Yang, and Forrest (HK))**

53.    On January 27, 2017, Xuejie Jia, Yong Yang, and Forrest (HK) used, directly or indirectly, multiple accounts to manipulate the stock price of Dawson Geophysical Co. ("DWSN"), which is listed on NASDAQ. Over the course of the day, they generated approximately $2,246 in illegal profits. What follows is a closer look at the trading during a few distinct periods.

   a.    At about 10:45:18 AM, the NBBO for DWSN was $8.18 by $8.27 per share.

   b.    Between approximately 10:45:18 AM and 10:45:52 AM, a Forrest (HK) brokerage account sent eight 100-share sell orders for DWSN to exchanges at progressively lower prices from $8.27 to $8.09 per share.

   c.    By approximately 10:45:52 AM, the NBBO for DWSN had fallen to $8.09 by $8.16 per share because of, at least in part, Forrest (HK)'s sell orders.

   d.    At approximately 10:47:11 AM, Xuejie Jia sent, directly or indirectly, a buy order to a non-exchange venue for 3,900 shares of DWSN with a limit price of $8.16 per share. Three of the Forrest (HK) account's orders remained outstanding at this time, including an order to sell 100 shares of DWSN with a limit price of $8.16 per share. Xuejie Jia's order was filled by another market participant at $8.15 per share. Following this fill, at approximately 10:47:18 AM, the Forrest (HK) account sent, directly or indirectly, another 100-share sell order for DWSN with a limit price of $8.17 per share. Approximately one second later, at 10:47:19 AM, Xuejie Jia sent, directly or indirectly, another buy order to a non-exchange venue for 3,000 shares of DWSN with a limit

price of $8.17 per share, which was filled approximately one second later a price of $8.15 per share.

e.  At about 12:53:59 PM, the NBBO for DWSN was $8.35 by $8.39 per share.

f.  Between approximately 12:53:59 PM and 1:03:27 PM, three Forrest (HK) accounts sent a total of 30 buy orders to exchanges for DWSN.  The orders ranged in size from 100 to 600 shares, though most were for 100 shares, and ranged in price from $8.30 to $8.54, and were typically entered at progressively higher prices.

g.  By approximately 1:03:27 PM, the NBBO for DWSN had risen to $8.46 by $8.54 per share because of, at least in part, Forrest (HK)'s buy orders.

h.  At approximately 1:03:29 PM, Yong Yang sent, directly or indirectly, a sell order to a non-exchange venue for 3,000 shares of DWSN with a limit price of $8.45 per share.  Several Forrest (HK) orders remained outstanding at this time, including five orders to buy 100 shares of DWSN with a limit price of $8.45 per share.  Yang's sell order was not immediately filled, and between 1:03:30 PM and 1:03:39 PM, a Forrest (HK) account entered three more 100-share buy orders with limit prices ranging from $8.54 to $8.57 per share.  At approximately 1:03:40 PM, Yang's order was filled by another market participant at prices from $8.45 to $8.47 per share.  Following the fill, between 1:03:46 PM and 1:03:55 PM, two Forrest (HK) accounts sent six more 100-share buy orders for DWSN at prices ranging from $8.45 to $8.56 per share.  While one of the 100-share buy orders priced at $8.45 per share was outstanding, Yong Yang sent, directly or indirectly, a 3,000-share sell

order to a non-exchange venue with a limit price of $8.45 per share, which was then filled by another market participant.

i.   Seconds later, between 1:04:04 PM and 1:04:54 PM, a Forrest (HK) account sent, directly or indirectly, three more 100-share buy orders for DWSN with limit prices from $8.55 to $8.56.  Then, at about 1:04:56 PM, Xuejie Jia sent, directly or indirectly, a sell order for 3,900 shares to a non-exchange venue with a limit price of $8.42 per share.  Between 1:04:57 PM and 1:05:01 PM, this order was partially filled by another market participant at prices between $8.42 and $8.45 per share.  At about 1:05:02 PM, the NBBO for DWSN had fallen to $8.36 by $8.42 per share, and a Forrest (HK) account sent, directly or indirectly, a 400-share buy order to an exchange with a limit price of $8.55 per share.  Then, between approximately 1:05:02 PM and 1:05:03 PM, another 600 shares of Xuejie Jia's order was filled by another market participant at $8.42 per share before the remainder of the order was canceled.

j.   At about 1:05:21 PM, the NBBO for DWSN was $8.36 by $8.50 per share.

k.   Between approximately 1:05:21 PM and 1:30:05 PM, two Forrest (HK) accounts sent eighteen 100-300 share buy orders to exchanges for DWSN at prices ranging from $8.39 to $8.51 per share, and by 1:30:16 PM, the NBBO for DWSN was $8.42 by $8.49 per share.

l.   At approximately 1:30:16 PM, Xuejie Jia sent, directly or indirectly, a sell order to a non-exchange venue for 3,393 shares of DWSN with a limit price of $8.39 per share.  Between approximately 1:30:16 PM and 1:30:19 PM, this order was partially filled by another market participant at prices from $8.39 to

$8.42 per share.  However, by 1:30:26 PM, the NBBO for DWSN had fallen to $8.36 by $8.39 per share.  A Forrest (HK) account then sent a 200-share buy order at a price of $8.39 per share to an exchange for DWSN, and the other market participant filled the remainder of Jia's order at $8.39 per share.

m.  At about 2:04:03 PM, the NBBO for DWSN was $8.36 by $8.42 per share.

n.  Between about 2:04:03 PM and 2:04:31 PM, a Forrest (HK) account sent, directly or indirectly, three 100-200 share buy orders to exchanges for DWSN with limit prices from $8.33 to $8.42 per share.  At approximately 2:04:34 PM, Xuejie Jia sent, directly or indirectly, a sell order to a non-exchange venue for 2,000 shares of DWSN with a limit price of $8.33 per share, which was filled by another market participant at prices between $8.33 and $8.37.

o.  Through this coordinated and manipulative trading, Xuejie Jia was able to buy, directly or indirectly, 6,900 shares of DWSN at a price of $8.15 per share and then sell, directly or indirectly, 6,900 shares of DWSN at prices between $8.33 and $8.45 per share.

**Example 5: HELE (April 9, 2018; Huailong Wang, Linlin Wu, and Yong Yang)**

54.     On or about April 9, 2018, Huailong Wang, Linlin Wu, and Yong Yang used, directly or indirectly, multiple accounts to manipulate the stock price of Helen of Troy Limited ("HELE"), which is listed on NASDAQ.  Over the course of the day, they generated approximately $12,015 in illegal profits.  What follows is a closer look at the trading during a few distinct periods.

a.  At about 10:41:47 AM, the NBBO for HELE was $84.60 by $84.80 per share.

b.  Between about 10:41:47 AM and 10:42:39 AM, Huailong Wang sent, directly or indirectly, ten 100-share and one 200-share sell orders for HELE to exchanges at progressively lower prices from $84.70 to $84.35 per share.

c.  By approximately 10:42:39 AM, the NBBO for HELE had fallen to $84.45 by $84.55 per share because of, at least in part, Huailong Wang's sell orders.

d.  At approximately 10:42:41 AM, Yong Yang sent, directly or indirectly, a buy order to a non-exchange venue for 5,500 shares of HELE with a limit price of $84.60 per share.  Yong Yang's order did not receive an immediate fill. Between approximately 10:42:42 AM and 10:42:47 AM, Huailong Wang sent, directly or indirectly, four more 100-200 share sell orders to exchanges with limit prices ranging from $84.60 to $84.40 per share.  At approximately 10:42:55 AM, Yong Yang received a partial fill (800 shares) from another market participant at price of $84.581 and then canceled the remainder of his order two seconds later.

e.  At about 10:43:07 AM, the NBBO for HELE was $84.55 by $84.70 per share.

f.  Between approximately 10:43:07 AM and 10:43:20 AM, Huailong Wang sent, directly or indirectly, four 100-share sell orders for HELE to exchanges with progressively lower limit prices from $84.65 to $84.40 per share.

g.  By approximately 10:43:20 AM, the NBBO for HELE had fallen to $84.40 by $84.60 per share because of, at least in part, Huailong Wang's sell orders.

h.  At approximately 10:43:27 AM, Yong Yang sent, directly or indirectly, a buy order to a non-exchange venue for 3,900 shares of HELE with a limit price of $84.60 per share. Yong Yang's order did not receive an immediate fill.

Between approximately 10:43:34 AM and 10:43:41 AM, Huailong Wang sent, directly or indirectly, three 100-share sell orders for HELE to exchanges with limit prices of $84.60 per share and one 100-share sell order for HELE to an exchange with a limit price of $84.65 per share. At approximately 10:43:41 AM, Yong Yang's order was filled by another market participant at $84.599 per share.

i. By about 10:45:57 AM, the NBBO for HELE was $84.75 by $85.05 per share.

j. Between approximately 10:45:57 AM and 10:47:09 AM, Huailong Wang and Linlin Wu sent, directly or indirectly, six 100-120 share sell orders for HELE to exchanges at prices ranging from $85.00 to $84.75 per share.

k. By approximately 10:47:09 AM, the NBBO for HELE had fallen to $84.65 by $84.85 per share because of, at least in part, Huailong Wang's and Linlin Wu's sell orders.

l. At approximately 10:47:10 AM, Yong Yang sent, directly or indirectly, a buy order to a non-exchange venue for 3,700 shares of HELE with a limit price of $84.85. At this time, Linlin Wu had two outstanding orders to sell 100 shares of HELE with a limit price of $84.85, and at approximately 10:47:12 AM, Wu sent, directly or indirectly, another 100-share sell order for HELE to an exchange with a limit price of $84.85 per share. At approximately 10:47:14 AM, Yang's order was filled by another market participant at a price of $84.75 per share, and seconds later, Wu canceled, directly or indirectly, her three 100-share orders to sell HELE at $84.85 per share.

m. At about 12:28:21 PM, the NBBO for HELE was $85.85 by $85.95 per share.

26

n.  Between approximately 12:28:21 PM and 12:28:32 PM, Huailong Wang sent, directly or indirectly, three 100-200 share buy orders for HELE to exchanges at prices ranging from $85.90 to $85.95 per share, and by approximately 12:28:58 PM, the NBBO for HELE had risen to $85.95 by $86.05 per share because of, at least in part, Huailong Wang's buy orders.

o.  At approximately 12:29:40 PM, Yong Yang sent, directly or indirectly, a sell order to a non-exchange venue for 6,400 shares of HELE with a limit price of $86.25 per share.  Yang's order was not immediately filled, and between approximately 12:39:27 PM and 12:40:09 PM, Huailong Wang sent, directly or indirectly, fifteen 100-300 share buy orders for HELE to exchanges at progressively higher prices from $85.90 to $86.25 per share.  At approximately 12:40:09 PM, Yang's order was filled by another market participant at $86.25 per share, and, seconds later, all of Huailong Wang's outstanding buy orders were canceled.

p.  At about 12:41:56 PM, the NBBO for HELE was $86.05 by $86.20 per share.

q.  Between approximately 12:41:56 PM and 12:42:23 PM, Huailong Wang sent, directly or indirectly, four 100-200 share buy orders for HELE to exchanges at prices ranging from $86.10 to $86.20 per share, and by approximately 12:42:23, the NBBO for HELE had risen to $86.10 to $86.25 per share because of, at least in part, Huailong Wang's buy orders.

r.  At 12:42:26 PM, Yong Yang sent, directly or indirectly, a sell order to a non-exchange venue for 2,000 shares of HELE with a limit price of $86.10 per share.  Yang's order was not immediately filled, and at approximately

12:42:31 PM, Huailong Wang sent, directly or indirectly, another 200-share

buy order for HELE to an exchange at $86.10. Yang's order was then filled

by another market participant at 12:42:31 PM at a price of $86.101.

s.    Through this coordinated and manipulative trading, Yong Yang was able to

buy, directly or indirectly, 8,400 shares of HELE at an average price of

$84.664 per share and then sell, directly or indirectly, 8,400 shares of HELE

at an average price of $86.214 per share.

**Example 6: AEMD (September 17, 2015; Shuang Chen, Lin Xing, and Forrest (HK))**

55.    On or about September 17, 2015, Shuang Chen, Lin Xing, and Forrest (HK) used,

directly or indirectly, multiple accounts to manipulate the stock price of Aethlon Medical, Inc.

("AEMD"), which is listed on NASDAQ.  That day, the operator(s) of the Shuang Chen

brokerage account and one of the Forrest (HK) brokerage accounts accessed those accounts from

the same IP address, while the operator(s) of the Lin Xing brokerage account and another Forrest

(HK) brokerage account accessed those accounts from the same IP address.  Over the course of

the day, they generated approximately $2,855 in illegal profits.  What follows is a closer look at

the trading during a few distinct periods.

a.    At approximately 10:24:07 AM, the NBBO for AEMD was $8.42 by $8.60

per share, and a Forrest (HK) account sent an order to an exchange to buy

10,000 shares of AEMD with a limit price of $8.43 per share.  A few seconds

later, between approximately 10:24:17 AM and 10:24:19 AM, Shuang Chen

sent, directly or indirectly, two orders—for 100 shares and 3,500 shares—to

the same exchange to sell AEMD at a limit price of $8.43.  The 100-share

order and 3,400 shares of Chen's 3,500-share order were filled by the Forrest

(HK) order, and a few seconds later, at 10:24:35 AM, the Forrest (HK) account canceled, directly or indirectly, the remainder of its order.

b.  Having just acquired 3,500 shares of AEMD at $8.43 per share, the Forrest (HK) account began selling, directly or indirectly, 100-share blocks of AEMD at prices below $8.42 per share.  Between approximately 10:24:45 AM and 10:25:23 AM, the Forrest (HK) account sent, directly or indirectly, ten 100-share sell orders for AEMD at prices ranging from $8.41 to $8.17 per share.

c.  Between approximately 10:24:42 AM and 10:25:25 AM, Shuang Chen also sent, directly or indirectly, numerous 100-share sell orders for AEMD, all priced with limits of $8.45 per share.

d.  By approximately 10:25:26 AM, the NBBO for AEMD had fallen to $8.36 by $8.45 per share because of, at least in part, Forrest (HK)'s and Shuang Chen's sell orders.

e.  At approximately 10:25:26 AM, Lin Xing sent, directly or indirectly, a buy order to a non-exchange venue for 4,800 shares of AEMD with a limit price of $8.45 per share.  At the same time, Shuang Chen sent, directly or indirectly, five 100-share sell orders to an exchange for AEMD with limit prices of $8.45 per share.  Xing's order received a fill from another market participant at $8.45 per share, and between approximately 10:25:27 AM and 10:25:28 AM, Xing sent, directly or indirectly, four more buy orders to a non-exchange venue, each for 4,800 shares of AEMD with a limit price of $8.45 per share.  Xing's orders received fills at prices between $8.449 and $8.45 per share, and

following these fills, at approximately 10:25:30 AM, Shuang Chen canceled, directly or indirectly, all of her outstanding sell orders for AEMD.

f.  At about 10:36:48 AM, the NBBO for AEMD was $8.60 by $8.70 per share.

g.  At approximately 10:36:48 AM, the Forrest (HK) account sent, directly or indirectly, an order to sell 2,600 shares of AEMD with a limit price of $8.64 per share, and, a few seconds later, at approximately 10:36:58 AM, Shuang Chen sent, directly or indirectly, an order to sell 1,700 shares of AEMD with a limit price of $8.64 per share. Then, at approximately 10:37:41 AM, Lin Xing sent, directly or indirectly, an order to buy 4,189 shares of AEMD with a limit price of $8.64 per share. Xing's order filled the Forrest (HK) order, and filled 1,589 shares of the Chen order, the remainder of which was then canceled.

h.  At approximately 12:53:15 PM, the NBBO for AEMD was $8.61 by $8.62 per share.

i.  Between approximately 12:53:15 PM and 1:25:45 PM, the aforementioned Forrest (HK) account along with two other Forrest (HK) accounts and Shuang Chen placed, directly or indirectly, 46 buy orders for AEMD at progressively higher prices from $8.62 to $8.75 per share. While the orders ranged in size from 100 to 300 shares, the majority were 100-share orders.

j.  By approximately 1:25:45 PM, the NBBO for AEMD had risen to $8.69 by $8.75 per share because of, at least in part, Forrest (HK)'s and Shuang Chen's buy orders.

k.  At approximately 1:25:46 PM, Lin Xing sent, directly or indirectly, a sell order to a non-exchange venue for 4,899 shares of AEMD with a limit price of

$8.68 per share.  The order was not immediately filled, and between approximately 1:25:46 PM and 1:25:47 PM, one of the Forrest (HK) accounts sent, directly or indirectly, two 100-share orders to buy AEMD with limit prices of $8.75 per share.  Then, at approximately 1:25:48 PM, Ling Xing sent, directly or indirectly, two more sell orders to non-exchange venues, each for 4,899 shares of AEMD with limit prices of $8.68 per share.  One was filled at $8.69 per share by another market participant, but the other was not.  At approximately 1:25:49 PM, the Forrest (HK) account sent, directly or indirectly, three more 100-share orders to buy AEMD with limit prices of $8.75 per share, and another market participant then filled 400 shares of Xing's outstanding orders, the remainder of which were canceled.

l.  After Xing's sales, at 1:26:09 PM, the NBBO for AEMD had fallen to $8.30 by $8.75 per share.

m.  Between approximately 1:26:09 PM and 1:27:35 PM, three Forrest (HK) accounts sent twenty-three 100-share buy orders for AEMD at prices ranging from $8.33 to $8.73 per share.

n.  By about 1:27:39 PM, the NBBO for AEMD was $8.60 by $8.65 per share.

o.  At approximately 1:27:39 PM, Lin Xing sent, directly or indirectly, a sell order to a non-exchange venue for 3,000 shares of AEMD with a limit price of $8.60 per share.  Seconds earlier, between approximately 1:27:14 PM and 1:27:35 PM, one of the Forrest (HK) accounts had sent, directly or indirectly, four 100-share buy orders for AEMD with limit prices of $8.60 per share and the orders remained outstanding.  Xing's order was filled by another market

participant at prices between $8.60 and $8.61 per share, and, following the

fill, Xing sent, directly or indirectly, another sell order to a non-exchange

venue for 3,000 shares of AEMD with a limit price of $8.60 per share. This

order was again filled by another market participant at a price of $8.60 per

share. Xing sold, directly or indirectly, the other shares she had acquired in a

similar manner.

**Example 7: ASRVP (September 26, 2014; Defendants Jiali Wang and Forrest (HK))**

56.     On or about September 26, 2014, Jiali Wang and Forrest (HK) used, directly or

indirectly, multiple accounts to manipulate the stock price of Ameriserv Financial Capital Trust I

PFD A GTD 8.45 ("ASRVP"), which is listed on NASDAQ. The operator of several Forrest

(HK) accounts and Jiali Wang accessed the accounts from the same IP address that day. Over

the course of the day, they generated approximately $1,514 in illegal profits. What follows is a

closer look at the trading during a few distinct periods.

a.  At approximately 9:47:17 AM, the NBBO for ASRVP was $26.61 by $28.17

per share, and a Forrest (HK) account sent, directly or indirectly, a 100-share

sell order for ASRVP to an exchange with a limit price of $27.30 per share.

At the same time, Jiali Wang placed a 99-share buy order for ASRVP with a

limit price of $27.30 per share. While the Forrest (HK) order was

immediately canceled, Jiali Wang's order was filled off-exchange by another

market participant at approximately 9:47:17 AM at a price of $27.30 per

share. By trading in coordination with the Forrest (HK) account in this

manner, Jiali Wang acquired, directly or indirectly, 495 shares of ASRVP

between approximately 9:47:17 AM and 11:01:50 AM at an average price of about $27.49 per share.

b.  At approximately 11:24:16 AM, the NBBO for ASRVP was at $27.60 by $28.17 per share, and Jiali Wang sent, directly or indirectly, a buy order to an exchange for 1 share of ASRVP at $28.09 per share.  He then canceled, directly or indirectly, the order a second later, and then sent, directly or indirectly, a sell order to the same exchange for 1,600 shares of ASRVP with a limit price of $28.09 per share.  One second later, at 11:24:27 AM, the Forrest (HK) account sent, directly or indirectly, a buy order to the same exchange for 1,600 shares with a limit price of $28.09 per share, which was then filled by Jiali Wang's sell order.

c.  At approximately 11:25:00 AM, the coordinated trading resumed as the Forrest (HK) account sent, directly or indirectly, another 100-share sell order for ASRVP to an exchange, this time with a limit price of $27.79 per share.  Between approximately 11:25:00 AM and 11:25:01 AM, Jiali Wang placed, directly or indirectly, seven 99-share buy orders for ASRVP with limit prices of $27.79 per share, but only one of them was filled by another market participant, and at approximately 11:25:01 AM, the Forrest (HK) account canceled, directly or indirectly, its 100-share sell order.  This coordinated trading continued for several minutes, and, between approximately 11:25:00 AM and 11:26:11, Jiali Wang acquired, directly or indirectly, an additional 396 shares of ASRVP at an average price of about $27.80 per share in this manner.

d.  At approximately 11:29:42 AM, the Forrest (HK) account sent, directly or
indirectly, a 1,700-share sell order for ASRVP to an exchange with a limit
price of $27.91 per share, which was between the NBBO of $27.60 by $28.17
per share.  Within one second, Jiali Wang placed, directly or indirectly, five
300-share buy orders for ASRVP with limit prices of $27.91 per share.  One
of Jiali Wang's orders was partially filled by another market participant, and
the Forrest (HK) order for 1,700 shares was then canceled at 11:29:43 AM.
Between approximately 11:29:42 AM and 11:30:05 AM, Jiali Wang acquired,
directly or indirectly, 199 shares of ASRVP at an average price of $27.915 per
share in this manner.

e.  At approximately 11:40:03 AM, Jiali Wang began placing, directly or
indirectly, smaller sell orders for ASRVP, while the Forrest (HK) account
began sending, directly or indirectly, 100-share buy orders for ASRVP.  For
instance, at approximately 11:44:29 AM, the Forrest (HK) account sent,
directly or indirectly, a 100-share order to buy ASRVP to an exchange with a
limit price of $28.76 per share, and at approximately 11:44:29 AM, Jiali
Wang placed, directly or indirectly, six 40-share sell orders with limit prices
of $28.70 per share.  Five of Jiali Wang's sell orders executed off-exchange
by approximately 11:44:30 AM, at which time the Forrest (HK) account
canceled its 100-share buy order.  By trading in coordination with the Forrest
(HK) account in this manner, Jiali Wang sold, directly or indirectly, 900
shares of ASRVP between approximately 11:41:57 AM and 11:46:24 AM at
prices between $28.70 and $28.76 per share.

    f.   Between approximately 12:14:02 PM and 12:14:03 PM, the Forrest (HK)
account sent, directly or indirectly, two 2,200-share buy orders for ASRVP to
an exchange with limit prices of $28.10 per share.  Then between
approximately 12:14:03 PM and 12:14:05 PM, Jiali Wang placed, directly or
indirectly, six 99-share sell orders for ASRVP.  Two of Jiali Wang's orders
were filled by another market participant off-exchange, and Forrest (HK) then
canceled, directly or indirectly, its buy orders between approximately
12:14:05 PM and 12:14:06 PM.  By trading in coordination with the Forrest
(HK) account in this manner, Jiali Wang sold, directly or indirectly, another
396 shares of ASRVP between approximately 12:14:03 PM and 12:15:40 PM
at prices between $28.08 and $28.13 per share.

**Example 8: GLDX (January 4, 2016; Defendants Jiafeng Wang and Forrest (HK))**

57.    On or about January 4, 2016, Jiafeng Wang and Forrest (HK) used, directly or
indirectly, multiple accounts to manipulate the price of Global X Gold Explorers ETF
("GLDX"), which was listed on NYSE Arca.  Over the course of the day, they generated
approximately $3,548 in illegal profits.  What follows is a closer look at the trading during a few
distinct periods.

    a.   At approximately 9:31:08 AM, the NBBO for GLDX was $16.43 by $16.63
per share, and Jiafeng Wang sent, directly or indirectly, a buy order to a non-
exchange venue for 8,998 shares of GLDX with a limit price of $16.65 per
share.  This order was filled by another market participant at prices between
$16.61 and $16.65 per share.

b.  At approximately 10:26:29 AM, the NBBO for GLDX was $16.96 by $17.03 per share.

c.  Between approximately 10:26:29 AM and 10:29:10 AM, two Forrest (HK) accounts sent, directly or indirectly, seven 100-share buy orders for GLDX to exchanges at progressively higher prices between $16.98 and $17.14 per share.

d.  By approximately 10:30:52 AM, the NBBO for GLDX had risen to $17.06 by $17.14 per share because of, at least in part, Forrest (HK)'s buy orders.

e.  At approximately 10:30:52 AM, Jiafeng Wang sent, directly or indirectly, a sell order to a non-exchange venue for 8,998 shares of GLDX with a limit price of $17.06 per share.  Another market participant filled 900 shares of this order at prices ranging from $17.06 to $17.07 per share before it was canceled at approximately 10:31:06 AM.  At approximately 10:31:26 AM, Jiafeng Wang sent, directly or indirectly, a sell order to a non-exchange venue for 8,098 shares of GLDX with a limit price of $17.02 per share.  This order was partially filled by another market participant between approximately 10:31:27 AM and 10:31:49 AM at prices from $17.03 to $17.02 share.  At approximately 10:32:00 AM, a Forrest (HK) account sent, directly or indirectly, a 100-share buy order for GLDX to an exchange with a limit price of $17.02 per share, and another 100 shares of Jiafeng Wang's order were filled by the other market participant.  Forrest (HK) accounts sent, directly or indirectly, two more 100-share buy orders at approximately 10:32:01 AM and

10:32:04 AM, and following each Forrest (HK) order, the other market

participant filled the remaining blocks of Jiafeng Wang's order.

f.   Through this coordinated trading, Jiafeng Wang was able to buy, directly or

indirectly, 8,998 shares of GLDX at prices between $16.61 and $16.65 per

share and then sell 8,998 shares of GLDX at prices between $17.02 and

$17.07 per share.

**Example 9: CHSCP (January 21, 2016; Jing Guan and Forrest (HK))**

58.     On or about January 21, 2016, Jing Guan and Forrest (HK) used, directly or

indirectly, multiple accounts to manipulate the stock price of CHS Inc. 8% Preferred Shares

("CHSCP"), which is listed on NASDAQ.  Over the course of the day, they generated

approximately $26,017 in illegal profits.  What follows is a closer look at the trading during a

few distinct periods.

a.   Between approximately 1:45:32 PM and 3:13:32 PM, Jing Guan sent, directly

or indirectly, several 3,200 to 4,800-share orders to buy CHSCP to non-

exchange venues.  The orders were filled by other market participants at

prices ranging from $29.315 to $30.04 per share, and by approximately

3:13:32 PM, Jing Guan had acquired 32,691 shares of CHSCP.

b.   At about 3:22:41 PM, the NBBO for CHSCP was $30.08 by $30.41 per share.

c.   Between approximately 3:22:41 PM and 3:25:11 PM, a Forrest (HK) account

sent, directly or indirectly, four 100-share buy orders for CHSCP at

progressively higher prices from $30.11 to $30.30 per share.

d.   By approximately 3:25:13 PM, the NBBO for CHSCP had risen to $30.30 by

$30.50 per share because of, at least in part, Forrest (HK)'s buy orders.

e.  At 3:25:13 PM, Jing Guan sent, directly or indirectly, a sell order for 4,800 shares of CHSCP to a non-exchange venue with a limit price of $30.20 per share.  Several Forrest (HK) buy orders were outstanding at this time, including two 100-share buy orders with limit prices of $30.24 and $30.30 per share.  Jing Guan's order was filled by another market participant at prices ranging from $30.30 to $30.32 per share.  Also, at about 3:25:13 PM, Jing Guan sent, directly or indirectly, another 4,800-share sell order for CHSCP to a non-exchange venue with a limit price of $30.20 per share, and this order was partially filled by another market participant at $30.28 per share.

f.  By about 3:37:45 PM, the NBBO for CHSCP was $30.09 by $30.38 per share.

g.  Between approximately 3:37:45 PM and 3:47:10 PM, two Forrest (HK) accounts sent, directly or indirectly, forty-five 100-share buy orders to exchanges for CHSCP, typically at progressively higher prices from $30.13 to $30.58 per share.

h.  By approximately 3:47:21 PM, the NBBO for CHSCP had risen to $30.40 by $30.60 per share because of, at least in part, Forrest (HK)'s buy orders.

i.  Between approximately 3:47:21 PM and 3:51:24 PM, Jing Guan sent, directly or indirectly, several large sell orders ranging in size from 631 to 3,800 shares to non-exchange venues for CHSCP, with limit prices between $30.15 and $30.30 per share.  Many were sent while there were outstanding Forrest (HK) buy orders on exchanges with equivalent or higher limit prices.  Guan's orders were filled or partially filled by other market participants at prices between $30.15 and $30.42 per share.

    j.    Through this coordinated trading, Jing Guan was able to sell, directly or indirectly, 32,691 shares of GLDX at prices between $30.15 and $30.42 per share, after acquiring these shares at prices between $29.135 and $30.04 per share.

**Example 10: SGRP (February 14, 2017; Vicky Liu, Tonghui Jia, and Forrest (HK))**

59.    On or about February 14, 2017, Vicky Liu, Tonghui Jia and Forrest (HK) used, directly or indirectly, multiple accounts to manipulate the stock price of SPAR Group Inc. ("SGRP"), which is listed on NASDAQ.  The operator(s) of the Vicky Liu and Tonghiu Jia accounts on that day accessed the accounts using the same IP address.  Over the course of the day, they generated approximately $5,410 in illegal profits.  What follows is a closer look at the trading during a few distinct periods.

    a.    At approximately 10:30:23 AM, the NBBO for SGRP was $1.04 by $1.10 per share, and a Forrest (HK) account sent, directly or indirectly, an order to an exchange to buy 7,500 shares with a limit price of $1.04.  This order went unfilled until about 10:30:46 AM when Tonghui Jia sent an order, directly or indirectly, to the same exchange to sell 600 shares of SGRP with a limit price of $1.04 per share, thereby filling 600 shares of the Forrest (HK) order. Between approximately 10:30:50 AM and 10:31:04 AM, Tonghui Jia sent, directly or indirectly, another four sell orders to the same exchange with limit prices of $1.04 for a total of 6,900 shares, thereby filling the remainder of the Forrest (HK) order.

b.  Then, between approximately 10:31:37 AM and 10:48:10 AM, the Forrest (HK) account then sent, directly or indirectly, a number of 100-share sell orders for SGRP to exchanges at prices from $1.08 to $1.01 per share.

c.  By approximately 10:48:16 AM, the NBBO for SGRP had fallen to $1.01 by $1.04 per share because of, at least in part, Forrest (HK)'s sell orders.

d.  Between approximately 10:48:16 AM and 10:48:23 AM, Tonghui Jia and Vicky Liu sent, directly or indirectly, three large buy orders (5,900 to 18,600 shares) for SGRP with limit prices of $1.04 per share.  Several Forrest (HK) sell orders were outstanding at this time, including four 100-share sell orders with limit prices of $1.04 per share.  The Tonghui Jia and Vicky Liu orders were filled at prices between $1.04 and $1.035 per share by approximately 10:48:24 AM.

e.  Between approximately 10:48:23 AM and 10:48:26 AM, a Forrest (HK) account sent three more 100-share sell orders to exchanges for SGRP with limit prices of $1.01 per share.  Then, at approximately 10:48:27 AM, Vicky Liu sent, directly or indirectly, a 5,900-share buy order for SGRP with a limit price of $1.04 per share, which was filled at $1.034 per share.

f.  By trading in this coordinated manner with the Forrest (HK) account, Vicky Liu and Tonghui Jia acquired, directly or indirectly, 46,000 shares of SGRP at prices ranging from $1.028 to $1.04 per share.

g.  By about 11:54:27 AM, the NBBO for SGRP was $1.10 by $1.15 per share.

h.  Between about 11:54:27 AM and 11:56:34 AM, two Forrest (HK) accounts
    sent, directly or indirectly, twenty-one 100-share and one 1-share buy orders
    to exchanges for SGRP with limit prices from $1.11 to $1.18 per share.

i.  By approximately 11:56:34 AM, the NBBO for SGRP had risen to $1.15 by
    $1.19 per share because of, at least in part, Forrest (HK)'s buy orders.

j.  At approximately 11:56:38 AM, Tonghui Jia sent, directly or indirectly, a sell
    order for 15,600 shares of SGRP with a limit price of $1.15 per share.  At this
    time, Forrest (HK) accounts had three outstanding 100-share buy orders for
    SGRP with limit prices between $1.15 and $1.17 per share, and between
    approximately 11:56:38 AM and 11:56:50 AM, a Forrest (HK) account sent,
    directly or indirectly, four more buy orders (ranging from 100-600 shares) for
    SGRP with limit prices of $1.15 per share.  At approximately 11:56:51 AM,
    Tonghui Jia's order to sell 15,600 shares of SGRP was filled by another
    market participant at $1.15 per share.

k.  By trading in this coordinated and manipulative manner with Forrest (HK)
    accounts between approximately 11:56:38 AM and 12:44:15 PM, Vicky Liu
    and Tonghui Jia were able to sell 42,200 shares of SGRP at prices between
    $1.15 and $1.174 per share.

### Example 11: BREW (September 27, 2018; Xiaosong Wang, Shun Sui, and Relief Defendants)

60.    On September 27, 2018, Xiaosong Wang and Shun Sui used, directly or indirectly,
multiple accounts to manipulate the stock price of Craft Brew Alliance ("BREW"), which is
listed on NASDAQ.  Over the course of the day, they orchestrated several manipulations

involving BREW, thereby generating about $6,003 in illegal profits.  What follows is a closer look at the trading during a few distinct periods.

    a.   At about 3:01:49 PM, the NBBO for BREW was $16.05 by $16.10 per share.

    b.   Between approximately 3:01:49 PM and 3:04:26 PM, two accounts in the name of Rishan Liu placed 21 buy orders for BREW stock.  These buy orders were sent at prices ranging from $16.10 to $16.15 per share, ranged in size from 100 to 300 shares, and were sent to exchanges.

    c.   Xiaosong Wang logged into at least one of the Rishan Liu accounts from an IP address linked to Xiaosong Wang's condominium in Upton, Massachusetts on this day.

    d.   By approximately 3:04:29 PM, the NBBO for BREW had risen to $16.15 by $16.20 per share because of, at least in part, the Rishan Liu accounts' buy orders.

    e.   At about 3:04:29 PM, an account in the name of Jingru Zhai placed an order to short sell 8,000 shares of BREW with a limit price of $16.15 per share, which was sent directly or indirectly to a non-exchange venue.  Xiaosong Wang logged into the Jingru Zhai account from his Upton, Massachusetts condominium on this day.  At this time, each of the Rishan Liu accounts had an outstanding order to buy 100 shares of BREW, one priced at $16.10 and the other priced at $16.15 per share.  By approximately 3:04:39 PM, only 300 shares of the Jingru Zhai account order had been filled by another market participant.  Then, between approximately 3:04:41 PM and 3:04:53 PM, the Rishan Liu accounts placed seven more orders to buy BREW at $16.15 per

share, and by about 3:04:53 PM, the remainder of the Jingru Zhai account's order was filled by another market participant at a price of $16.15 per share.

f.   At about 3:05:06 PM, the NBBO for BREW was $16.10 by $16.15 per share.

g.   Between approximately 3:05:06 PM and 3:05:43 PM, the Rishan Liu accounts placed seven more orders to buy BREW stock.  These orders were priced at $16.15 per share, ranged in size from 1 share to 100 shares, and were sent to exchanges.

h.   By approximately 3:05:43 PM, the NBBO for BREW had risen to $16.15 by $16.20 per share because of, at least in part, the Rishan Liu accounts' buy orders.

i.   At about 3:05:43 PM, the Jingru Zhai account placed another order to short sell 8,000 shares of BREW with a limit price of $16.15 per share, which was sent directly or indirectly to a non-exchange venue.  At this time, there was an outstanding Rishan Liu account order to buy 100 shares of BREW at $16.15 per share.  By about 3:05:46 PM, only 234 shares of the Jingru Zhai account order had been filled by another market participant.  Then, between about 3:05:48 PM and 3:05:54 PM, one of the Rishan Liu accounts placed seven more orders to buy BREW at $16.15 per share, and by about 3:05:53 PM, the remainder of the Jingru Zhai account order had been filled by another market participant at a price of $16.15 per share.

j.   At about 3:18:07 PM, the NBBO for BREW was $16.15 by $16.25 per share.

k.   Between approximately 3:18:07 PM and 3:28:42 PM, the Rishan Liu accounts and an account in the name of Shun Sui placed 70 orders to sell BREW stock.

43

These orders were generally placed at progressively lower prices from $16.20 to $16.00 per share, they ranged in size from 2 to 1,000 shares, and they were generally sent to exchanges.

l.  By about 3:28:43 PM, the NBBO for BREW had fallen to $16.00 by $16.05 per share because of, at least in part, the Liu and Sui accounts' sell orders.

m.  At approximately 3:28:43 PM, the Jingru Zhai account placed an order to buy 8,000 shares of BREW with a limit price of $16.05 per share, which was sent directly or indirectly to a non-exchange venue.  At this time, one of the Rishan Liu accounts had an outstanding order to sell 100 shares of BREW at $16.05 per share.  By about 3:28:43 PM, only 300 shares of Jingru Zhai's order had been filled by another market participant.  Then, between about 3:28:48 PM and 3:28:56 PM, one of the Rishan Liu accounts sent another eight orders to sell BREW at $16.05 per share, and by about 3:28:56 PM, the remainder of the Jingru Zhai account order had been filled by another market participant at a price of $16.05 per share.

n.  At about 3:29:03 PM, the NBBO for BREW was $16.05 by $16.10 per share.

o.  Between about 3:29:03 PM and 3:30:51 PM, the Rishan Liu accounts and the Shun Sui account sent 25 more orders to sell BREW stock.  The prices for these orders ranged from $16.10 to $16.05 per share (with most being priced at $16.05), they ranged in size from 2 to 500 shares, and they were sent to exchanges.

p.   By about 3:30:52 PM, the NBBO for BREW had fallen to $16.00 by $16.10 per share because of, at least in part, the Rishan Liu and Shun Sui accounts' sell orders.

q.   At about 3:30:52 PM, the Jingru Zhai account placed another order to buy 8,000 shares of BREW with a limit price of $16.05 per share, which was sent directly or indirectly to a non-exchange venue.  One second later, at about 3:30:53 PM, a Rishan Liu account sent an order to an exchange to sell 100 shares of BREW with a limit price of $16.05 per share.  By about 3:31:00 PM, only 1,031 shares of the Jingru Zhai account order had been filled by another market participant and the NBBO for BREW had reverted to $16.05 by $16.10 per share, so the remainder of the Jingru Zhai account order for 6,969 shares was canceled.

r.   Between about 3:31:02 PM and 3:32:04 PM, the Rishan Liu accounts sent another 18 orders to sell BREW stock at $16.05 per share, and by about 3:32:08 PM, the NBBO for BREW had fallen again to $16.00 by $16.05 per share because of, at least in part, the Rishan Liu accounts' sell orders.

s.   At about 3:32:09 PM, the Jingru Zhai account placed an order to buy 6,969 shares of BREW with a limit price of $16.05, which was sent directly or indirectly to a non-exchange venue.  Only 100 shares of the Jingru Zhai account order were immediately filled by another market participant.  Then, between about 3:32:12 PM and 3:32:22 PM, a Rishan Liu account sent another 11 orders to sell BREW at $16.05 per share, and by approximately

3:32:22 PM, the remainder of the Jingru Zhai account order had been filled by
another market participant at $16.05 per share.

t.   Through this coordinated trading, the Jingru Zhai account was able to short
sell 16,000 shares of BREW at a price of $16.15 per share and then buy
16,000 shares of BREW to cover the short sales at a price of $16.05 per share.

**Example 12: IFMI (June 16, 2014; Jiali Wang, Forrest (HK), and Relief Defendant)**

61.   On June 16, 2014, Jiali Wang and Forrest (HK) used, directly or indirectly,
multiple accounts to manipulate the stock price of Institutional Financial Markets Inc. ("IFMI"),
which was listed on NYSE.  Over the course of the day, they orchestrated several manipulations
involving IFMI, thereby generating about $941 in profits.  What follows is a closer look at the
trading during a few distinct periods.

a.   At about 11:12:03 AM, the NBBO for IFMI was $2.00 by $2.05 per share.

b.   At about 11:12:03 AM, an account in the name of Forrest (HK) placed an order to
sell 100 shares of IFMI at $2.02 per share, which was sent, directly or indirectly,
to an exchange. The Forrest (HK) account was logged into from a computer with
the PC User name "wangjiali" and MAC address d4:be:d9:98:03:c4, and from the
U.S.-based IP address 73.186.85.150.  That same day, on June 16, 2014, Jiali
Wang logged into his bank account from the same IP address (73.186.85.150),
and, prior to June 16, 2014, Wang had logged into a brokerage account in his
name from a computer with the same MAC address (d4:be:d9:98:03:c4).

c.   Three seconds later, at about 11:12:06 AM, an account in the name of Weiguo
Guan placed an order to buy 3,000 shares of IFMI at $2.02 per share, which was
sent, directly or indirectly, to a non-exchange venue and immediately filled by
another market participant.  Like the Forrest (HK) account, the Weiguo Guan

account was logged into from a computer with the PC User name "wangjiali" and MAC address d4:be:d9:98:03:c4, and from the U.S.-based IP address 73.186.85.150.  Jiali Wang was in the United States at this time, while Weiguo Guan was not.

d.  Then, at approximately 11:12:09 AM, after the Weiguo Guan account's order was filled, the Forrest (HK) account canceled its order to sell 100 shares of IFMI at $2.02 per share.

e.  At about 11:28:49 AM, the NBBO for IFMI was $1.97 by $2.00 per share.

f.  Between about 11:28:49 AM and 11:29:19 AM, the aforementioned Forrest (HK) account and another account in the name of Forrest (HK) placed nine orders to sell IFMI. These orders ranged in size from 100 to 500 shares, they were placed at progressively lower prices from $1.97 to $1.92 per share, and they were sent, directly or indirectly, to exchanges.

g.  By about 11:29:20 AM, the NBBO for IFMI had fallen to $1.90 by $1.92 per share because of, at least in part, the Forrest (HK) accounts' sell orders.

h.  At about 11:29:20 AM, the Weiguo Guan account placed an order to buy 3,000 shares of IFMI with a limit price of $1.92 per share, which was sent, directly or indirectly, to a non-exchange venue and immediately filled by another market participant at $1.92 per share.  Seconds later, the two Forrest (HK) accounts canceled all of their outstanding orders to sell IFMI, including an order to sell 200 shares at $1.92 per share.

i.  At about 3:47:08 PM, the NBBO for IFMI was $2.07 by $2.10 per share.

j.  Between approximately 3:47:08 PM and 3:47:32 PM, one of the Forrest (HK)

accounts placed seven 100-share orders to buy IFMI stock.  These orders were

placed at progressively higher prices from $2.08 to $2.16 per share, and they were

sent, directly or indirectly, to exchanges.

k.  By about 3:47:41 PM, the NBBO for IFMI had risen to $2.16 by $2.19 per share

because of, at least in part, the Forrest (HK) account's buy orders.

l.  At about 3:47:41 PM, the Weiguo Guan account placed an order to sell 9,000

shares of IFMI with a limit price of $2.16 per share, which was sent, directly or

indirectly, to a non-exchange venue.  At the time, the Forrest (HK) account had an

outstanding order to buy 100 shares of IFMI at $2.16 per share.  Only 200 shares

of the Weiguo Guan account's order was filled by another market participant at

$2.16 per share and the remainder was canceled at about 3:47:43 PM.

m.  At about 3:47:49 PM, the Forrest (HK) account placed an order to buy 200 shares

of IFMI at $2.16 per share, which was sent, directly or indirectly, to an exchange.

While that order was still outstanding, at about 3:47:55 PM, the Weiguo Guan

account placed an order to sell 5,000 shares of IFMI with a limit price of $2.16

per share, which was sent, directly or indirectly, to a non-exchange venue.  Only

200 shares of the Weiguo Guan account's order was filled by another market

participant at $2.16 per share and the remainder was canceled at approximately

3:47:57 PM.

n.  Between about 3:48:02 PM and 3:48:10 PM, the Forrest (HK) account placed two

200-share orders to buy IFMI at $2.15 per share, which were sent, directly or

indirectly, to exchanges.  While those orders were still outstanding, at about

3:48:18 PM, the Weiguo Guan account placed an order to sell 5,000 shares of IFMI with a limit price of $2.15 per share, which was sent, directly or indirectly, to a non-exchange venue. None of the Weiguo Guan account's order was filled, and it was canceled at about 3:48:21 PM. A few seconds later, at about 3:48:26 PM, the Weiguo Guan account placed a smaller order to sell 3,000 shares of IFMI with a limit price of $2.15 per share, which was sent, directly or indirectly, to a non-exchange venue and immediately filled by another market participant at $2.15 per share. Shortly thereafter, the Forrest (HK) account canceled its two 200-share orders to buy IFMI at $2.15 per share.

o. In a similar manner, between approximately 3:48:52 PM and 3:52:31 PM, the Weiguo Guan account sold another 3,520 shares of IFMI at prices ranging from $2.15 to $2.08 per share.

## **Defendants' Efforts to Conceal Their Fraudulent Scheme**

62. The Defendants knew, or were reckless in not knowing, that they were engaging in a securities fraud scheme. The Defendants received numerous warnings about their manipulative trading.

63. For example, on or about March 11, 2014, a United States-based brokerage firm sent Jiali Wang an email stating, in relevant part: "[w]e have been notified that certain recent trading activity in your account(s) is of a type that may draw scrutiny from exchanges and/or regulators. Specifically, where accounts with a single beneficial owner, or accounts under common control, or otherwise related accounts, are on both the buy side and the sell side of a transaction (often referred to as a "cross" or "wash trade"), this activity may – depending on the

intent of the trader(s) – be a violation of exchange rules or of the Securities Exchange Act of 1934 or of the Commodity Exchange Act or other applicable rules and laws."

64.    Shortly thereafter, Jiali Wang responded by stating: "All listed stocks were researched by my stock screener software. I bought the stock when I found it has a large volume of stocks traded, and sold it when the price went to be profitable. But sometime, the stock went out of my pre-judgment, and I chose to stop losses by according to the trading volume and price direction. Meantime, symbol HSKA was one of the long-term stocks that I held, and I continued to buy more around $7.20, and sold it in profit. Another symbol FLML took a short position at $7.54, but I closed the position by suffering the losses because it did not go to my expected trend. And other stocks accumulated by based on the direction of the market trading volume."

65.    Jiali Wang's response was false or materially misleading because, in actuality, he was engaging in a market manipulation scheme to artificially affect the price of certain stocks, including the securities of Heska Corporation ("HSKA") and Flamel Technologies SA ("FLML").

66.    As another example, on or about February 29, 2016, a United States-based brokerage firm sent Xiaosong Wang an email stating, in relevant part: "Our records indicate that you had orders rejected for possible cross trades violations at our firm in February. Some of the trades are noted below as follows: . . . Cross/wash trade rejects occur when a client enters an order to buy and sell a specific security simultaneously, near or at the same price. Our review is done to ensure customer protection and market integrity. Cross/wash trades can be viewed as a form of market manipulation and could result in a significant federal violation. . . Please respond in writing as to the economic rationale and/or trading strategy used when you placed the above reference trades."

67.     As Xiaosong Wang knew, several of the trades flagged by this United States-based broker were, in fact, part of the fraudulent market manipulation scheme set forth herein. But, Xiaosong Wang provided the following false and materially misleading response: "I found that when I want to sell these positions, I used the wrong hot key, and the buy orders may be placed, so the sell orders were rejected, I have changed the setting of hot keys for Sell orders, so I think I will be ok. I apologize for any inconvenience caused the mistake."

68.     Other than Vicky Liu, who is closely connected to Jiali Wang, each of the Defendants received warnings about their trading and/or notice that at least one of their accounts was being closed.  In fact, a large number of the Defendants' brokerage accounts were closed by brokerage firms during the Relevant Period as a result of the trading activity therein.

### Disposition of Manipulation Proceeds

69.     After the Defendants received notice that an account of theirs was being closed, they often transferred their manipulation proceeds from the closed account to another of their brokerage accounts or to one of their foreign bank accounts.

70.     While funds sent by the Defendants to other brokerage accounts were frequently used to perpetrate further securities manipulations, some of the funds wired overseas were later wired back to other Defendants.  For example, between about June 12, 2018 and July 3, 2018, Linlin Wu transferred approximately $1,200,000 from one of her domestic brokerage accounts to a foreign bank account in her name, and then on about July 17, 2018, she wired approximately $200,000 from this foreign bank account to a domestic bank account in the name of Jiali Wang.

### Relief Defendants

71.     Jiali Wang operated one or more Weiguo Guan brokerage accounts.  During the Relevant Period, Jiali Wang generated, directly or indirectly, proceeds from manipulative trading

in one or more Weiguo Guan brokerage accounts. Weiguo Guan has no legitimate interest in, or right to, the funds he received, directly or indirectly, from the Defendants' fraudulent scheme.

72.    Xiaosong Wang operated one or more Jingquan Liu brokerage accounts. During the Relevant Period, Xiaosong Wang generated, directly or indirectly, proceeds from manipulative trading in one or more Jingquan Liu brokerage accounts. Jingquan Liu has no legitimate interest in, or right to, the funds he received, directly or indirectly, from the Defendants' fraudulent scheme.

73.    Xiaosong Wang operated one or more Rishan Liu brokerage accounts. During the Relevant Period, Xiaosong Wang generated, directly or indirectly, proceeds from manipulative trading in one or more Rishan Liu brokerage accounts. Rishan Liu has no legitimate interest in, or right to, the funds he received, directly or indirectly, from the Defendants' fraudulent scheme.

74.    Xiaosong Wang operated one or more Luping Wang brokerage accounts. During the Relevant Period, Xiaosong Wang generated, directly or indirectly, proceeds from manipulative trading in one or more Luping Wang brokerage accounts. Luping Wang has no legitimate interest in, or right to, the funds he received, directly or indirectly, from the Defendants' fraudulent scheme.

75.    Xiaosong Wang operated one or more Weigang Yang brokerage accounts. During the Relevant Period, Xiaosong Wang generated, directly or indirectly, proceeds from manipulative trading in one or more Weigang Yang brokerage accounts. Weigang Yang has no legitimate interest in, or right to, the funds he received, directly or indirectly, from the Defendants' fraudulent scheme.

76.    Xiaosong Wang operated one or more Jingru Zhai brokerage accounts. During the Relevant Period, Xiaosong Wang generated, directly or indirectly, proceeds from

manipulative trading in one or more Jingru Zhai brokerage accounts. Jingru Zhai has no legitimate interest in, or right to, the funds she received, directly or indirectly, from the Defendants' fraudulent scheme.

77.     Also during the Relevant, Xiaosong Wang transferred money to one or more of the Relief Defendants to fund, at least in part, brokerage accounts in the Relief Defendants' names, which brokerage accounts Xioasong Wang used in furtherance of the manipulative scheme described herein. The Relief Defendants have no legitimate claim to the funds transferred by Xioasong Wang, or by any other Defendant.

**FIRST CLAIM FOR RELIEF**
**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder**
**(All Defendants)**

78.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 77 above.

79.     By reason of the conduct described above, the Defendants, directly or indirectly, alone or in concert with others, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

80.     The Defendants acted knowingly or recklessly.

81.     By reason of the foregoing, the Defendants violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

82.     By reason of the conduct described above, the Defendants, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, each other's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

83.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], the Defendants are liable for each other's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### Violation of Securities Act Section 17(a)(1) and (3)
### (All Defendants)

84.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 77 above.

85.     By engaging in the conduct described above, the Defendants, in the offer or sale of securities, acting with the requisite degree of scienter, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, alone or in concert with others:  (a) knowingly or recklessly, employed devices, schemes or artifices to defraud; and (b) with negligence, engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers.

86.     The Defendants acted knowingly, recklessly, or negligently.

87.     By reason of the foregoing, the Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

88.     By reason of the conduct described above, the Defendants, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, each other's violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

89.     Accordingly, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], the Defendants are liable for each other's violations of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**THIRD CLAIM FOR RELIEF**
**MARKET MANIPULATION**
**Violation of Exchange Act Section 9(a)(2)**
**(All Defendants)**

90.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 77 above.

91.     By engaging in the conduct described above, the Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the prices of such securities, for the purpose of inducing the purchase or sale of such securities by others, including but not limited to, the Defendants' acts of engaging in securities transactions that affected the volume and prices of certain securities for the purpose of inducing the purchase or sale of such securities by others.

92.     The Defendants acted with the intent to induce trading by others.

93.     By reason of the foregoing, the Defendants have violated and, unless enjoined, will continue to violate Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)].

94.     By reason of the conduct described above, the Defendants, acting knowingly or recklessly, provided substantial assistance to, and thereby aided and abetted, each other's violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)].

95.     Accordingly, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], the Defendants are liable for each other's violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. §78i(a)(2)].

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (All Relief Defendants)

96.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 77 above.

97.     The Relief Defendants have no legitimate interest in, or right to, the funds they received, directly or indirectly, from the Defendants' fraudulent scheme.

98.     As a result, Weiguo Guan, Jingquan Liu, Rishan Liu, Luping Wang, Weigang Yang, and Jingru Zhai are liable as relief defendants for unjust enrichment and should be required to return their ill-gotten gains, with prejudgment interest.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.     Finding that Defendants violated Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 78q(a)] and Exchange Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2), 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5] thereunder;

B.     Permanently restraining and enjoining the Defendants, and all persons in active concert or participation with them, from violating Securities Act Section 17(a) [15 U.S.C. § 78q(a)] and Exchange Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2), 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

C.     Ordering the Defendants and the Relief Defendants to disgorge all ill-gotten gains as a result of the conduct alleged in this Complaint, plus pre-judgment interest;

D.    Ordering the Defendants to pay civil monetary penalties pursuant to Securities

Act Section 20(d) [15 U.S.C.§ 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C.§

78u(d)(3)];

E.    Retaining jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.    Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

The Commission hereby demands a trial by jury on all claims so triable.

DATED this 15th day of October 2019

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

*/s/ Eric Forni*
Eric Forni (BBO No. 669685)
    Senior Trial Counsel
Andrew Palid (BBO No. 664968)
    Senior Counsel
Martin F. Healey (BBO No. 227500)
    Regional Trial Counsel
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street, 24th Floor
Boston, Massachusetts  02110
Telephone:  (617) 573-8827 (Forni direct)
Facsimile:  (617) 573-4590
ForniE@sec.gov (Forni email)